The Honorable Richard A. Jones

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

CHANGPENG ZHAO, aka "CZ,"

Defendant.

NO. CR23-179 RAJ

**UNITED STATES' SENTENCING MEMORANDUM**

## INTRODUCTION

"Better to ask for forgiveness than permission." That's what Defendant Changpeng Zhao, founder, owner, and Chief Executive Officer of Binance, the world's largest cryptocurrency exchange, told members of his team about Binance's compliance with U.S. law. Zhao and Binance specifically targeted U.S. users as part of Binance's growth strategy, knew that this choice subjected Binance to U.S. laws, but for years deliberately ran the company in violation of U.S. law. As Zhao admitted, breaking U.S. law was critical to the company's success and profitability. Zhao bragged that if Binance complied with U.S. law, it would not be "as big as we are today" and "would also not have had any US revenue we had for the last 2 years. And further, [Binance] would not have had additional revenue resulted (sic) from the network effect."

U.S. Sentencing Memo – 1
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Zhao's willful violation of U.S. law was no accident or oversight. He made a business decision that violating U.S. law was the best way to attract users, build his company, and line his pockets. Despite knowing Binance was required to comply with U.S. law, Zhao chose not to register the company with U.S. regulators; he chose not to comply with fundamental U.S. anti-money-laundering (AML) requirements; he chose not to implement and maintain an effective know-your-customer (KYC) system, which prevented effective transaction monitoring and allowed suspicious and criminal users to transact through Binance; and even when Binance employees detected suspicious transactions, Zhao's choices meant those transactions were not reported to U.S. authorities. And when it became clear that Binance had a critical mass of lucrative U.S. customers, Zhao directed Binance employees in a sophisticated scheme to disguise their customers' locations in an effort to deceive regulators about Binance's client base. Critically, Zhao knew that his decision not to implement an effective AML program would result in Binance facilitating transactions between U.S. users and users in Iran and other sanctioned countries and regions in violation of U.S. law.

Zhao's strategy worked: Binance—operating on a Wild West model that, as one compliance employee said, told criminals "come to binance we got cake for you"—quickly became the colossus of crypto exchanges. As a result, Zhao is one of richest people in the world and a celebrity in the crypto industry. Zhao bet that he would not get caught, and that if he did, the consequences would not be as serious as the crime.

But Zhao was caught, and now the Court will decide what price Zhao should pay for his crimes. The sentence in this case will not just send a message to Zhao but also to the world. Zhao reaped vast rewards for his violation of U.S. law, and the price of that violation must be significant to effectively punish Zhao for his criminal acts and to deter others who are tempted to build fortunes and business empires by breaking U.S. law. Accordingly, the United States recommends that the Court impose an above-Guidelines sentence of 36 months of imprisonment.

U.S. Sentencing Memo – 2
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## PROCEDURAL BACKGROUND

Zhao ran Binance, a money services business (MSB) that operated wholly or in substantial part in the United States from 2017 through 2022. Zhao willfully failed to implement an effective AML program as required by the Bank Secrecy Act (BSA). As a result of Zhao's choice, Binance processed transactions involving proceeds of unlawful activity, including funds involved in transactions between U.S. persons and persons in comprehensively sanctioned jurisdictions, in violation of U.S. sanctions.

In November 2023, Zhao entered a Rule 11(c)(1)(A) guilty plea to one count: willful failure to maintain an effective AML program, in violation of 31 U.S.C. §§ 5318(h), 5322(b), 5322(e), and 31 C.F.R. § 1022.210(a). The statutory penalties include a maximum term of imprisonment of up to ten years; a period of supervision following release of up to three years; a potential probationary period of up to five years; a fine of up to $500,000 and, in addition, a fine equal to the profit Zhao gained by reason of the offense; and a mandatory special assessment of $100.

As part of that plea agreement (¶¶ 12–13), under 31 U.S.C. § 5322(e), the parties agreed to recommend to the Court that Zhao would pay a fine of $50 million. The parties further agreed (¶ 10) to the applicable Guidelines calculation except as to the applicability of USSG § 2S1.3(b)(1), which provides a two-level enhancement where "the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." As detailed below, that enhancement applies because Zhao knew that Binance processed funds that were proceeds of unlawful activity or were used to promote unlawful activity. With the enhancement, Zhao's offense level is 13. At criminal history category I, his advisory Guidelines range is 12 to 18 months in prison.

But this case warrants an upward variance from that Guidelines range. The scope and ramifications of Zhao's misconduct were massive—Binance engaged in transactions orders of magnitude larger than the BSA originally contemplated for MSBs and well beyond what the Guidelines address—and an upward variance is appropriate here to

U.S. Sentencing Memo – 3
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  account for the scale of Zhao's violation. An upward variance is further justified by the

2  need for Zhao's sentence to reflect the significant harm to U.S national security caused by

3  his criminal acts, a circumstance also not accounted for in the sentencing range advised by

4  the Guidelines for his offense of conviction. A custodial sentence of 36 months—twice the

5  high end of the Guidelines range—would reflect the seriousness of the offense, promote

6  respect for law, afford adequate deterrence, and be sufficient but not greater than necessary

7  to achieve the goals of sentencing.

8  **FACTS**

9  Zhao violated U.S. law on an unprecedented scale. He led a massive financial

10  institution that, as of 2022, processed trillions of dollars in cryptocurrency trades per year

11  and massively profited from the U.S. financial system, U.S. businesses, and U.S.

12  customers—all without playing by U.S. rules. He ran Binance with deliberate disregard for

13  the company's legal responsibilities and for its capacity to cause significant harm, and

14  because of his conduct, Binance processed millions of dollars of unlawful proceeds.

15  Zhao's sentence should reflect the gravity of his crimes. Financial institutions are

16  the first line of defense for the U.S. financial system. Accordingly, the BSA places special

17  responsibilities on financial institutions, requiring them to implement AML programs that

18  protect the institutions themselves and the broader financial system from criminal schemes.

19  Because Zhao refused to implement an effective AML program, Zhao and Binance put

20  U.S. customers, the U.S. financial system, and U.S. national security at risk, exposing our

21  financial system and citizens to those who sought to exploit them, including criminal actors

22  seeking a safe haven for the proceeds of their unlawful activity. And because Zhao willfully

23  failed to implement an effective compliance program and disregarded U.S. law, Binance

24  caused violations of U.S. sanctions in excess of $898 million.

25

26

27

U.S. Sentencing Memo – 4
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**A.    Zhao led Binance to become the world's largest cryptocurrency exchange by exploiting the U.S. market while defying U.S. law**

Zhao founded Binance in 2017. By 2018, Binance.com was the world's largest cryptocurrency exchange. It grew quickly to dominate the cryptocurrency space by targeting the lucrative U.S. market, particularly high-volume "VIP" customers. Zhao knew that serving U.S. customers required Binance to comply with U.S. law, including the BSA. But Zhao calculated that compliance was too expensive: Binance would have to either implement effective AML controls, including KYC measures and transaction monitoring, which would cost both money and customers who would leave Binance rather than provide required information, or offboard lucrative U.S. customers, limiting its growth.

Zhao knew that, as an MSB, Binance was required to implement an effective AML program that was reasonably designed to prevent Binance from being used to facilitate money laundering. An effective AML program includes an effective system for collecting identifying information about customers through KYC protocols, monitoring transactions for suspicious activity, and filing Suspicious Activity Reports (SARs) with the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). But Binance allowed certain customers (called "Tier 1" customers) to open accounts and deposit, trade, and withdraw cryptocurrency by providing only an email address. As Zhao knew, these "Tier 1" customers comprised most of Binance's customers until 2022, when Binance implemented a policy requiring its customers to complete KYC. Further, as Zhao knew, for much of the relevant period, Binance did not systematically monitor transactions for suspicious activity, and Binance never filed a SAR with FinCEN.

**B.    Because Zhao failed to implement an effective AML program, illicit actors flocked to the exchange and Binance harmed U.S. national security by violating sanctions against Iran**

In part because Zhao failed to implement an effective AML program at Binance, illicit actors used Binance's exchange in various ways, including operating mixing services that hid the source and ownership of cryptocurrency; transacting in illicit proceeds from

U.S. Sentencing Memo – 5
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  ransomware attacks; and moving proceeds of darknet market transactions, exchange hacks,

2  and various internet-related scams. For example, between August 2017 and April 2022,

3  there were direct transfers of about $106 million in bitcoin to Binance.com wallets from

4  Hydra, the world's then-largest darknet marketplace used by criminals to facilitate the sale

5  of illegal goods and services.[1] These transfers occurred over time to a relatively small

6  number of unique addresses—reflecting "cash out" activity by repeat Hydra users, such as

7  vendors selling illicit goods or services. Similarly, from February 2018 to May 2019,

8  Binance processed more than $275 million in deposits and more than $273 million in

9  withdrawals from BestMixer—one of the largest cryptocurrency mixers in the world until

10  it was shut down by Dutch authorities in May 2019.

11      Moreover, Binance's decision not to implement an effective AML program as

12  required by U.S. law, despite its reliance on U.S. customers to provide liquidity for the

13  exchange, caused violations of comprehensive U.S. sanctions imposed to protect against

14  the "unusual and extraordinary threat to the national security, foreign policy, and economy

15  of the United States" presented by the actions and policies of the Government of Iran. *See*

16  Executive Order 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995). The comprehensive sanctions

17  first imposed in 1995 and expanded by numerous subsequent executive orders, protect the

18  United States from these threats by effectively cutting off all U.S. commercial activity with

19  Iran, thereby denying the Iranian government access to the resources it requires to carry

20  out the activities and policies that threaten the United States.[2]

21

22

23
___

24  [1] The Department of Justice seized Hydra in 2022, which had received over $5billion in cryptocurrency between 2015 and 2022.

25  [2] *See* Statement of Director R. Richard Newcomb to the Senate Banking, Housing and Urban Affairs Committee (Oct. 30, 1997) (noting that E.O. 12959 on May 6, 1995, "effectively ended U.S. commercial activity with respect to Iran"), *available at* https://home.treasury.gov/news/press-releases/rr2034; *see also* "U.S. Sanctions on Iran," Congressional

26  Research Service (July 20, 2023) (noting that "U.S. sanctions on Iran are arguably the most extensive and comprehensive set of sanctions that the United States maintains on any country" and that they seek "to deny the Iranian

27  government financial resources and compel it to make policy changes."), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12452.

U.S. Sentencing Memo – 6
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Binance critically undermined the effectiveness of U.S. sanctions against Iran by

2    providing its Iranian customers the ability to transact with the U.S. customers that Binance

3    depended on to provide liquidity on the exchange. Zhao and other Binance senior leaders

4    knew that Binance served customers both in the United States and in jurisdictions subject

5    to comprehensive U.S. sanctions; that U.S. sanctions laws generally prohibited U.S.

6    persons from transacting with persons in jurisdictions subject to comprehensive U.S.

7    sanctions; that Binance's proprietary "matching engine" would necessarily cause U.S.

8    persons to transact with persons in jurisdictions subject to comprehensive U.S. sanctions;

9    and that Binance did not have controls in place to prevent such violations of U.S. law—

10   because Binance chose not to collect KYC information from most of its user base or

11   implement effective blocks based on internet protocol (IP) addresses. Because Binance

12   chose not to implement comprehensive controls blocking transactions that violated U.S.

13   sanctions, between in or about January 2018 through May 2022, Binance caused at least

14   1.1 million transactions in violation of U.S. sanctions between customers in the United

15   States and customers ordinarily resident in Iran, with an aggregate transaction value of at

16   least $898,618,825. Binance also caused millions of dollars in trades between U.S.

17   customers and customers in other comprehensively sanctioned jurisdictions, including

18   Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk.

19   The broad U.S. sanctions against Iran are intended to protect Americans from the

20   threat to U.S. national security and foreign policy posed by the Iranian government's

21   proliferation of weapons of mass destruction, state-sponsored terrorist activity, and efforts

22   to destabilize the Middle East. Under Zhao's direction, Binance caused violations of U.S.

23   sanctions on a significant scale that damaged U.S. national security and endangered the

24   integrity of the international financial system.

25

26

27

U.S. Sentencing Memo – 7
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C.      Zhao deceived U.S. regulators as part of his scheme to evade U.S. law**

As founder and CEO, Zhao built Binance as a company that attempted to operate outside the jurisdiction of any government and cultivated a culture that disregarded compliance with legal obligations. When Binance grew to the point it could no longer hide from government regulation and law enforcement, Zhao and other senior leaders developed and implemented a scheme to evade U.S. law through manipulation and deception. While creating a public façade that Binance would play by the rules, Zhao and other senior leaders developed and executed a plan to keep Binance's most lucrative U.S. customers on Binance.com to ensure Binance would continue to benefit from its U.S. customer base without complying with U.S. law.

In 2018, Binance engaged a consultant who proposed various avenues through which the Company could mitigate its regulatory exposure. Presented with a range of options from the "low-risk" full compliance with U.S. law to the "high-risk" status quo, Binance, at Zhao's direction, chose a middle ground that nonetheless continued to violate U.S. law. The scheme was simple but required significant coordination to carry out. On one hand, Binance created a new U.S. exchange to serve U.S. customers and announced that Binance.com would "block" U.S. persons. On the other, Binance secretly kept the most profitable U.S. customers on Binance.com without taking steps to bring Binance.com into full compliance with U.S. law.

On recorded calls in June 2019, Zhao and other Binance leaders devised the scheme. As Zhao knew and discussed with other senior leaders, Binance.com's approximately 11,000 VIP customers accounted for 70% of its trading revenue, and about one-third of those VIPs were U.S. persons. Rather than lose its U.S. VIP customers, Zhao approved a plan where employees would help the VIP customers hide their U.S. connections, including by guiding them to create new accounts with non-U.S. KYC information. As Zhao explained on one recorded call in June 2019, Binance sought to "achieve a reduction in our own losses and, at the same time, to be able to have U.S. supervision agencies not cause us

any troubles," with the "goal" of having "U.S. users slowly turn into . . . other users"—though Binance "cannot say this publicly, of course."

The plan worked: Binance maintained a substantial base of lucrative, liquidity-providing U.S. customers even after launching the new U.S. exchange, Binance.US. According to an internal monthly report, one year after purportedly blocking U.S. users, in September 2020, Binance still had more than 2.5 million U.S. customers, more than from any other country. The next month, to continue to conceal these connections, Binance turned these users into "other" users by removing the United States label from this report and recategorizing U.S. users with the label "UNKWN." In October 2020, according to the internal monthly report, "UNKWN" users represented about 17% of Binance's registered user base. And according to Binance's own transaction data, U.S. users conducted trillions of dollars in transactions on Binance.com between August 2017 and October 2022 that made the company more than $1.6 billion in profit, resulting, as Zhao acknowledged, from U.S. users and the network effect they generated.

### SENTENCING GUIDELINES CALCULATION

Under the plea agreement, the parties agree that these Guidelines provisions apply:

- A base offense level of 8 under USSG § 2S1.3(a)(1);
- A two-level increase for a conviction of an offense under Chapter 53 of Title 31, United States Code, and involving more than $100,000 in a 12-month period, under USSG § 2S1.3(b)(2); and
- A four-level role enhancement under USSG § 3B1.1(a).

These agreed provisions would result in an offense level of 14.

Along with those agreed Guidelines provisions, the Court should also impose a two-level increase under USSG § 2S1.3(b)(1) because, as discussed in the next section, a preponderance of the evidence shows that Zhao knew or believed that at least some funds his company processed were proceeds of unlawful activity.

Applying that two-level enhancement brings Zhao's offense level to 16. If the Court imposes that enhancement, the parties agree that Zhao may qualify for a three-level

U.S. Sentencing Memo – 9
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

reduction for acceptance of responsibility under USSG § 3E1.1(b). With acceptance-of-responsibility credit, Zhao's total offense level is 13. At criminal history category I, his advisory Guidelines range is 12 to 18 months in prison.[3]

### UNITED STATES' RECOMMENDATION

Given the magnitude of Zhao's willful violation of U.S. law and its consequences, an above-Guidelines sentence of 36 months is warranted.[4] That sentence, together with the agreed $50 million fine, is sufficient but not greater than necessary to balance the relevant 18 U.S.C. § 3553(a) factors and achieve the goals of sentencing.

**A.     The Court should impose the unlawful-proceeds Guidelines enhancement**

The Court should impose the two-level enhancement in USSG § 2S1.3(b)(1) because a preponderance of the evidence shows that Zhao knew or believed that at least some funds his company processed were proceeds of unlawful activity.

Section 2S1.3(b)(1) imposes a two-level enhancement for BSA violations if "the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." The defendant need not know or believe that all or a significant portion of the funds were connected to unlawful activity. Instead, the enhancement applies if the defendant knew or believed that any funds involved in the violation were unlawful proceeds or promoted unlawful activity. *See United States v. Wisniewski*, 121 F.3d 54, 57 (2d Cir. 1997) (interpreting similar enhancement in USSG § 2S1.1(b)(1) for money laundering). Conscious avoidance can satisfy the mens rea requirement for applying this enhancement. *See United States v. Finkelstein*, 229 F.3d 90, 95–96 (2d Cir. 2000) (also interpreting USSG § 2S1.1(b)(1)).

---

[3] If the Court does not impose the unlawful-funds enhancement, Zhao would qualify for only a two-level acceptance-of-responsibility reduction, *see* USSG § 3E1.1(a), resulting in an advisory Guidelines range of 10 to 16 months—the range proposed by U.S. Probation. PSR ¶ 144.

[4] The government intends to seek remand of the defendant at sentencing in the event the Court imposes a custodial sentence. *See* 18 U.S.C. § 3143(a)(1).

U.S. Sentencing Memo – 10
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Zhao's plea agreement allows the parties to "present arguments regarding the applicability of" this two-level enhancement. Plea Agreement ¶ 10. The government bears the burden of proving the enhancement's applicability by a preponderance of the evidence. *See United States v. Ehmer*, 87 F.4th 1073, 1137–39 (9th Cir. 2023); *United States v. Parlor*, 2 F.4th 807, 816–17 (9th Cir. 2021). Contrary to U.S. Probation's tentative Guidelines recommendation,[5] the evidence easily satisfies that standard and triggers this enhancement.[6] The facts admitted by Zhao and Binance, along with the evidence and reliable public reporting, together prove that Zhao knew that Binance did not have effective AML controls and that, as a result, illicit actors used Binance.com to launder proceeds of unlawful activity. The evidence also shows that Zhao knew that Binance would cause U.S. customers to trade with customers in Iran and other countries and regions subject to comprehensive U.S. sanctions. The funds involved in those trades, and the fees that Binance earned from processing those trades, became proceeds of unlawful activity, and Binance facilitated later transfers of these proceeds, including when U.S. customers closed their accounts and withdrew their funds.

1.   **Zhao knew Binance processed transactions involving the proceeds of unlawful activity**

First, Zhao has admitted facts supporting the enhancement, acknowledging that Binance processed transactions that he knew or believed involved the proceeds of unlawful

---

[5] *See* PSR Addendum 8–9 & n.11 (noting that "[b]oth parties present reasonable arguments on the applicability of the enhancement, but the research represented by all sides fails to articulate a clear standard," so not recommending the disputed two-level enhancement, but noting that "[if] the Court finds that the *mens rea* can be satisfied by 'conscious avoidance,' we would likely agree with the government that the evidence here meets that standard by a preponderance of the evidence, for the reasons he government has stated").

[6] The government timely objected to the Probation Department's determination not to include the enhancement in its Guidelines estimate, and in its Addendum the Probation Department indicates that despite the government's objection it is not recommending the enhancement because of what the Probation Department perceives as the lack of a "clear standard." We respectfully disagree with Probation's reasoning and urge the Court to impose the enhancement. *See* PSR Addendum 8–9 & n.11 (noting that "[b]oth parties present reasonable arguments on the applicability of the enhancement, but the research represented by all sides fails to articulate a clear standard," so not recommending the disputed two-level enhancement, but noting that "[if] the Court finds that the *mens rea* can be satisfied by 'conscious avoidance,' we would likely agree with the government that the evidence here meets that standard by a preponderance of the evidence, for the reasons he government has stated").

U.S. Sentencing Memo – 11
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

activity. According to the facts he admitted in his plea agreement, "[a]s a result of [Zhao's] willful failure to implement an effective AML program, Binance processed transactions involving proceeds of illegal activity." Plea Agreement ¶ 9.a. As Zhao knew, "[b]ecause Binance during the relevant period did not require all users to complete" KYC protocols "and did not have procedures to systematically monitor transactions and report suspicious activity, Binance lacked effective controls to prevent it from processing transactions involving proceeds of illicit activity on behalf of its customers." *Id.* ¶ 9.j.

The statement of facts in Binance's plea agreement (Dkt. 23, Case No. CR23-178 RAJ) and public reporting analyzing blockchain activity likewise support applying this Guidelines enhancement in Zhao's case. The Court is free to consider the company's plea agreement and that reporting when sentencing Zhao. *See* 18 U.S.C. § 3661; USSG § 1B1.4. Zhao was the founder and Chief Executive Officer of Binance.com and was significantly involved in and responsible for decisions about Binance's operations. Zhao personally determined what AML standards Binance would meet, including whether it implemented effective KYC protocols. And employees openly discussed that it was challenging to implement AML controls because Zhao "doesn't see a need to." Zhao and most of the crypto world knew that the failure to implement these controls provided an opportunity for criminal actors to exploit Binance. Indeed, in the 2017–2022 period covered by the plea agreement, it was well known that illicit actors used Binance to process large volumes of proceeds of unlawful activity. That Binance was processing transactions involving illicit funds was obvious to compliance employees and criminals alike. As one Binance compliance employee said, "we need a banner 'is washing drug money too hard these days – come to binance, we got cake for you.'"

And in 2020, it was widely published that Binance had significant illicit transactions in part due to its weak KYC controls. For example, in January 2020, blockchain-analytics firm Chainalysis reported that in 2019 Binance processed $770 million in funds from illicit actors—representing 27.5% of all illicit funds processed by cryptocurrency exchanges,

U.S. Sentencing Memo – 12
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

more than any other exchange.[7] Zhao was aware of this reporting, which highlighted the need for tighter KYC procedures at crypto exchanges including Binance.[8] Regardless of whether Zhao believed that the public reporting was accurate in all respects, it underscores what Zhao already knew and believed; by choosing to have an ineffective AML program, Zhao caused Binance to process criminal funds until at least October 2022.[9]

Zhao knew and understood that his decisions with respect to Binance's AML program would likely have the result that Binance would facilitate these types of illicit transactions. And, of course, the company has admitted that illicit actors used Binance.com in various ways including "operating mixing services that obfuscated the source and ownership of cryptocurrency; transacting illicit proceeds from ransomware variants; and moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams." Binance Plea Agreement, Attachment A ¶ 56. For example, as described above, between August 2017 and April 2022, about $106 million worth of bitcoin was directly transferred to Binance.com wallets from Hydra—a popular Russian darknet marketplace often used by criminals that facilitated the sale of illegal goods and services, in a manner indicating illicit activity. Binance Plea Agreement, Attachment A ¶ 57. Similarly, from February 2018 to May 2019, Binance processed more than $275 million in

---

[7] CHAINALYSIS, The 2020 State of Crypto Crime (Jan. 2020), https://go.chainalysis.com/2020-crypto-crime-report.

[8] *See* Binance CEO accuses Chainalysis of 'bad business' over AML report. Yahoo Finance. https://finance.yahoo.com/news/binance-ceo-accuses-chainalysis-bad-130023983.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAANK8cysllSKIVszzuxyEPpep5gmtPzh9dUJrbZgOCV7P59xsb2h53LETRxu4Vu9OmPq30c5GyP05qI8irHpGq-byb-RXnmeem3SIZ8xqwYC0OKtmav-R-mW1WjurPR99zfbEE7ipMBH00ac8OehsMxpvaFCH7zSPW2j-6vK77LR (Jan. 20. 2020) (reporting that Zhao blamed Chainalysis for the illicit activity and thought the reporting was "bad business etiquette").

[9] A 2022 Reuters investigation suggests that Binance continued to process a significant volume of proceeds of unlawful activity, finding that in Binance's five years of operation, the company "served as a conduit for the laundering of at least $2.35 billion in illicit funds." Angus Berwick & Tom Wilson, REUTERS, *How crypto giant Binance became a hub for hackers, fraudsters and drug traffickers*, June 6, 2022, https://www.reuters.com/investigates/special-report/fintech-crypto-binance-dirtymoney.

U.S. Sentencing Memo – 13
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

deposits and more than $273 million in withdrawals from BestMixer before it was shut down by Dutch authorities in 2019. *Id.* ¶ 58.[10]

### 2. Zhao knew Binance processed transactions involving the proceeds of sanctions violations

Second, the evidence also shows that Zhao knew that Binance would cause U.S. customers to trade with customers in Iran and other countries and regions subject to comprehensive U.S. sanctions. As Zhao admitted, Binance "caused transactions between U.S. persons and persons in jurisdictions that are subject to comprehensive U.S. sanctions." Plea Agreement ¶ 9.a. Zhao admitted that he understood that U.S. law prohibited U.S. persons from conducting certain financial transactions with countries, persons, or entities sanctioned by the U.S. government. *Id.* ¶ 9.k. Zhao also knew that both U.S. customers and customers in comprehensively sanctioned jurisdictions used Binance.com. And Binance employees, including the then chief compliance officer, specifically warned Zhao about legal risks related to transactions involving such U.S. customers and customers in comprehensively sanctioned jurisdictions, explaining "we currently have users from sanction countries on [Binance].com[.] …[and d]ownside risk is if fincen or ofac has concrete evidence we have sanction [sic] users, they might try to investigate or blow it up big on worldstage." *Id.* Zhao further knew that without an effective AML compliance program with appropriate KYC procedures, Binance would not be able to systematically block illegal transactions between U.S. customers and customers subject to U.S. sanctions. *Id.* ¶ 9.l.

Zhao admits he did not implement controls that would have prevented Binance from causing trades between U.S. customers and customers subject to U.S. sanctions, and "it was reasonably foreseeable to [Zhao] that Binance's matching engine—the tool that

---

[10] *See* Europol, Multi-million euro cryptocurrency laundering service Bestmixer.io taken down, May 22, 2019, https://www.europol.europa.eu/media-press/newsroom/news/multi-million-euro-cryptocurrency-laundering-service-bestmixerio-taken-down.

U.S. Sentencing Memo – 14
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

matched customer bids and offers to execute cryptocurrency trades—would match U.S. users and users in comprehensively sanctioned jurisdictions." Plea Agreement ¶ 9.m. Similarly, Binance has admitted that because of the significant number of users in countries subject to comprehensive U.S. sanctions and the substantial number of U.S. customers trading on Binance.com, "Binance's matching engine would necessarily cause U.S. users to transact with users in comprehensively sanctioned jurisdictions." Binance Plea Agreement, Attachment A ¶ 61. Binance admitted that it knew that by "causing and facilitating such unlawful transactions it would be acting in violation of U.S. law." *Id.* Binance further transferred the proceeds of these illegal trades and profited off these transfers.

Zhao also admits that between August 2017 and October 2022—according to the company's own data—"Binance caused . . . at least $890 million in transactions between U.S. users and users Binance identified as Iranians," plus "millions more in transactions between U.S. users and users in other comprehensively sanctioned jurisdictions, including Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk." *Id.* ¶ 9.o. The company "profited significantly from its violations of law," including through the "significant fees" it earned "on transactions between U.S. customers and customers in comprehensively sanctioned jurisdictions." *Id.* ¶ 9.p. The hundreds of millions of dollars involved in trades that violated U.S. sanctions, and the fees that Binance earned from processing those trades, became proceeds of unlawful activity. Binance facilitated later transfers of those proceeds, including when its customers withdrew their funds from the exchange. Zhao knew about the users in comprehensively sanctioned areas, did not direct Binance to implement controls that would have prevented Binance from matching U.S. users with users subject to U.S. sanctions to conduct cryptocurrency transactions, and those transactions were a clear and foreseeable result of Zhao's decision to prioritize profit and growth over compliance with the BSA.

U.S. Sentencing Memo – 15
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    For all these reasons, a preponderance of the evidence establishes that Zhao should
2    receive the two-level enhancement under USSG § 2S1.3(b)(1). He willfully failed to
3    maintain an effective AML program at Binance, knowing that an effective AML program
4    was necessary to prevent illicit actors from using the exchange. And he knew that without
5    such an effective AML program, illicit actors could and did use Binance to process
6    hundreds of millions of dollars of illicit proceeds. Zhao also knew that Binance would
7    cause trades that violated U.S. sanctions, creating proceeds of unlawful activity. In sum,
8    Zhao knew or believed that at least some of the funds Binance processed were proceeds of
9    unlawful activity. Accordingly, the two-level enhancement applies.

10   **B.    Regardless of the Guidelines calculation, the Court should impose a 36-month**
11        **sentence to hold Zhao accountable for his intentional criminal conduct and**
        **achieve the other goals of sentencing**

12       Given the gravity of Zhao's crimes, a sentence within the 12-to-18-month advisory
13   Guidelines range (or a 10-to-16-month range) does not appropriately take into
14   consideration the 18 U.S.C. § 3553(a) factors. And a sentence within such a range would
15   not adequately reflect the seriousness of Zhao's offense, promote respect for law, provide
16   just punishment, or offer adequate specific or general deterrence.

17       Instead, the Court should impose a sentence of 36 months' imprisonment. Combined
18   with the $50 million fine recommended in the plea agreement, a 36-month custodial
19   sentence would reasonably balance the section 3553(a) factors. In particular, such a
20   sentence would provide adequate deterrence to Zhao and to others who may also be
21   tempted to put profits above compliance with U.S. law while knowing the serious collateral
22   consequences of allowing criminals and sanctioned persons and entities unfettered access
23   to the U.S. financial system. Zhao committed serious crimes in a deliberate scheme to grow
24   Binance as quickly as possible and then to maintain its dominance as the largest
25   cryptocurrency exchange. His crimes warrant meaningful prison time.

26       When Zhao pleaded guilty to violating the BSA, he agreed to a recommended fine
27   of $50 million—a small fraction of his wealth but a historically large fine for an individual

U.S. Sentencing Memo – 16
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

U.S. defendant. For its part, Binance agreed to a combined penalty of over $4.3 billion—the largest amount ever paid by an MSB in connection with a guilty plea in a U.S. criminal case. These exceptional financial penalties—which directly resulted from Zhao's conduct—demonstrate the nature and seriousness of Zhao's offense. Those penalties are tied directly to the profits Binance earned and the vast transactions it processed, reflecting the extraordinary scope of the scheme. Accordingly, an upward variance from the 12-to-18-month Guidelines range is justified here.

An upward variance is particularly appropriate here, as the Sentencing Guidelines for BSA offenses are not designed to adequately punish either misconduct on this scale or misconduct that harms U.S. national security. The BSA was developed to ensure that U.S. financial institutions implement and maintain adequate controls to prevent drug traffickers, terrorists, and other criminal actors from laundering illicit proceeds and accessing the U.S. financial system. The law recognizes the power of U.S. financial institutions as gatekeepers to the world's financial system and tasks those financial institutions with commensurate responsibility to know their customer base, monitor transactions, and take reasonable steps to ensure that they do not offer a haven for criminals. Zhao deliberately disregarded this responsibility, and thus Binance provided such a haven.

When Congress expanded the BSA to apply to MSBs in 1994, Congress focused on contemporary challenges of small MSB operations offering drug traffickers an avenue to launder proceeds in volumes measured in the thousands. *See* Money Laundering Suppression Act of 1994 (P.L. 103-325). Congress could not predict that 30 years later, a cryptocurrency exchange could and would, in the space of less than two years, provide rapid, irreversible money transmission services moving trillions of dollars annually to individuals around the world, including U.S. persons and persons in comprehensively sanctioned jurisdictions.

Indeed, the Guidelines reflect the BSA's original focus on relatively small-dollar operations, recommending a two-level enhancement "for a pattern of unlawful activity

U.S. Sentencing Memo – 17
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

involving more than $100,000," USSG § 2S1.3(b)(2), but offering no further enhancements even where the unlawful activity involves transactions amounting to millions or billions of dollars, as is the case here. By contrast, the loss table for basic economic offenses provides more granular enhancements for the pecuniary harm caused by the criminal conduct, with a 16-point enhancement for loss exceeding $1.5 million and a 30-point enhancement for loss in excess of $550 million, USSG § 2B1.1(b)(1), corresponding to sentences of imprisonment that could range from four to 20 years. Suffice it to say, the advisory Guidelines range does not account for the pertinent factors in this case. The range would be the same regardless of whether the defendant's crime involved $100,000 or $1 trillion, and no matter how many hundreds of millions of dollars in suspicious or criminal transactions flowed through Binance's platform.

Nor do the Guidelines for BSA offenses adequately address the harms to U.S. national security caused by the scale of Binance's sanctions violations. Had Zhao complied with the BSA and implemented an effective AML program, Binance would not have executed nearly $900 million in transactions between its Iranian and U.S. customers that undermined the objectives of a critical national security tool that the United States relies upon to protect Americans from the harmful activities and policies of the Iranian government. Nothing in the sentencing range advised by the Guidelines for the offense of conviction takes into account the harm that Zhao's conduct caused to U.S. national security.

Given this context, and the significant harm caused by Zhao's misconduct—Binance processed trillions of dollars in unmonitored transactions, hundreds of millions of dollars in transactions involving illicit proceeds, and over a billion dollars in transactions that violated sanctions—any custodial sentence of less than three years would fail to reflect the gravity of his offense.

U.S. Sentencing Memo – 18
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C.    Zhao should receive a meaningful custodial sentence**

Respectfully, in no event should the Court impose a noncustodial sentence. As U.S. Probation correctly notes, "A custodial sentence is necessary to appropriately punish the defendant's conduct and provide adequate general and specific deterrence." USPO Rec. 7. But the below-Guidelines sentence of just five months in custody that U.S. Probation recommends does not satisfy those goals or the other section 3553(a) factors. As described infra, the Guidelines do not adequately account for the scope and seriousness of Zhao's crime. U.S. Probation identifies mitigating factors including "Zhao's extraordinary acceptance of responsibility" and collateral consequences of prosecution including Zhao stepping down as CEO of Binance. But, respectfully, these are not extraordinary acts or consequences. Zhao made the smart choice to come to the United States and take responsibility well after he violated the law because he knew the alternative was a life of flight. Zhao made the right choice, but it is not one that warrants a 50% downward variance in sentence. Similarly, the collateral consequences of Zhao's plea were the result of Zhao's crime. When a crypto currency exchange serves U.S. customers, it is a U.S. financial institution that must comply with U.S. law. Zhao violated that law and resigning as CEO of that financial institution is an appropriate and foreseeable result of Zhao's choice to deliberately violate the law. None of these facts warrants a variance from the bottom of the (already inadequate) Guidelines range and the Court should not so depart.

While some courts have imposed relatively light sentences for BSA violations, those cases are readily distinguishable from Zhao's crimes. For example, in 2022 the former CEO of the cryptocurrency exchange BitMEX, Arthur Hayes, was sentenced to six months home detention and two years of probation after pleading guilty to a BSA violation with Guidelines range of 6 to 12 months. *United States v. Hayes*, 1:20-CR-500 (S.D.N.Y. May 20, 2022). But comparing that case to this one is inapposite, given the scope and severity of Zhao's crimes and the significant harm that they caused to U.S. national security.

U.S. Sentencing Memo – 19
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

To take but one data point illustrating the inapt comparison between the BSA violations of BitMEX's former CEO Hayes and Zhao's massive crimes—in announcing its enforcement actions against BitMEX and then Binance, FinCEN noted that BitMEX failed to file SARs "on at least 588 specific suspicious transactions,"[11] while Binance failed to report "well over 100,000 suspicious transactions that it processed as a result of its deficient controls."[12] Thus, by at least that metric, the BSA violations Zhao committed at Binance were approximately 170 times more severe than those committed by Hayes at BitMEX, and a sentence significantly more severe than that received by Hayes is warranted.

Nor did the BitMEX case present anywhere the harm to national security caused by Binance's failure to implement and maintain adequate compliance controls, and the sanctions violations that resulted. As described above, Binance allowed nearly $900 million in transactions between its U.S. users and users in Iran, in addition millions of dollars more in transactions between U.S. users and users in Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk.

If Zhao's sentence is to have any meaningful deterrent effect on similarly situated executives of large financial institutions that operate in the United States while flouting U.S. law in the name of profits, Zhao must face meaningful prison time. A three-year custodial sentence, together with the agreed $50 million fine, would achieve specific and general deterrence, and would reasonably balance the other 18 U.S.C. § 3553(a) factors. A noncustodial sentence, by contrast, would send exactly the wrong message to other potential offenders and to Zhao himself.

---

[11] FinCEN, Press Release, FinCEN Announces $100 million Enforcement Action Against Unregistered Futures Commission Merchant BitMEX for Willful Violations of the Bank Secrecy Act, Aug. 10, 2021, https://www.fincen.gov/news/news-releases/fincen-announces-100-million-enforcement-action-against-unregistered-futures#:~:text=WASHINGTON%E2%80%94The%20Financial%20Crimes%20Enforcement,BSA)%20and%20Fin CEN's%20implementing%20regulations.

[12] U.S. Treasury Announces Largest Settlements in History with World's Largest Virtual Currency Exchange Binance for Violations of U.S. Anti-Money Laundering and Sanctions Laws, Nov. 21, 2023, https://home.treasury.gov/news/press-releases/jy1925.

U.S. Sentencing Memo – 20
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In mitigation, Zhao may argue that he, belatedly, implemented controls at Binance; stepped aside as CEO; pleaded guilty pre-indictment and came to the United States from the United Arab Emirates; stayed in the US. pursuant to the Court's order; and obeyed the Court's directives, including by reporting his travel. Zhao may also argue that because he was required to remain in the continental United States, he should not have to serve a custodial sentence. And Zhao may point to the letters of support submitted by his friends and fans of Binance. None of these arguments would justify a noncustodial sentence or downward variance.

Many of Binance's most significant controls were implemented long after December 2020, when Binance was notified of this investigation, are required to comply with law, and are still untested and incomplete. For example, Binance's violation of Iran sanctions continued through May 2022, with other sanctions violations continuing until October 2022. Binance Plea Agreement, Attachment A ¶¶ 79–80. Yet the company did not require customers to provide full KYC information until May 2022, despite KYC being necessary to prevent just such sanctioned transactions. *See* Binance Plea Agreement, Attachment A ¶ 53. Though Zhao directed Binance to remediate the sanctions violations in 2018 and 2019, he did so knowing the remediation would be ineffective. Binance Plea Agreement, Attachment A ¶¶ 70–71. As Zhao himself put it, "better to ask for forgiveness than permission."

Indeed, throughout the course of conduct outlined in this case, Zhao faced a choice: ask for permission or ask for forgiveness. Once he knew he was caught, he faced a similar choice: he could be charged and spend his life looking over his shoulder, unable to travel or live freely, worried the U.S. government would vigorously seek his arrest; or he could take responsibility, travel to the United States, plead guilty, and argue for a probationary sentence, betting that he would be able to remain free in advance of sentencing. Zhao has received credit for his choice to plead guilty. While he has complied with the Court's bail order, his liberty was virtually unrestricted and he has traveled freely (from Telluride to

U.S. Sentencing Memo – 21
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Los Angeles, and from Moab to New York). He has also received certainty. While he does not know precisely what sentence he will receive, he knows that when it is done, he can return to his life, not worrying about when the U.S. government will arrest him. While Zhao's decision to take responsibility and seek forgiveness was the right one, it does not warrant a non-custodial sentence. Such a sentence would minimize the gravity of his crime and send a message to others inclined to commit these crimes that the cost is low, that indeed it is better to ask for forgiveness than permission. The Court should reject these arguments and impose a 36-month sentence, demonstrating to Zhao and the world that the right choice, every time, is to comply with the law.

U.S. Sentencing Memo – 22
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**CONCLUSION**

2

The Court should sentence Zhao to 36 months in prison and a $50 million fine.

3

April 23, 2024

4

Respectfully submitted,

5

6

TESSA M. GORMAN
United States Attorney

7

*s/ Michael Dion*

8

MICHAEL DION
JONAS LERMAN

9

Assistant United States Attorneys
700 Stewart Street, Suite 5220

10

Seattle, WA 98101-1271

11

(206) 553-7970
michael.dion@usdoj.gov

12

jonas.lerman@usdoj.gov

13

14

MARGARET A. MOESER
Acting Chief

15

*s/ Kevin G. Mosley*

16

KEVIN G. MOSLEY
ELIZABETH R. CARR

17

Trial Attorneys

18

Money Laundering and Asset Recovery
Section, Criminal Division

19

U.S. Department of Justice

20

JENNIFER KENNEDY GELLIE

21

Executive Deputy Chief performing the
duties of Chief

22

23

*s/ Beau D. Barnes*
BEAU D. BARNES

24

ALEX WHARTON
Trial Attorneys

25

Counterintelligence and Export Control

26

Section, National Security Division
U.S. Department of Justice

27

U.S. Sentencing Memo – 23
*United States v. Zhao* / CR23-179 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970