# EXHIBIT D

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHANGPENG ZHAO,<br><br>Defendant. | CASE NO. CR 23-179 (RAJ)<br><br>DECLARATION OF<br>ROBERT J. PALMQUIST IN SUPPORT OF<br>DEFENDANT CHANGPENG ZHAO'S<br>SENTENCING MEMORANDUM |

**DECLARATION OF ROBERT J. PALMQUIST**

I, Robert J. Palmquist, hereby declare under penalty of perjury the following:

**Background of Declarant**

1. I am an independent prison consultant based in Loon Lake, Washington. From February 1982 through September 2009, I was employed by the Department of Justice, Federal Bureau of Prisons ("BOP"), and served in many capacities. I am a United States Department of Justice Prison Rape Elimination Act ("PREA") Auditor.

2. I attended Washington State University from 1976 to 1982 and received a Bachelor

1  of Arts degree in Criminal Justice in 1980, followed by a Master of Arts degree in Criminal Justice
2  in 1982.

3        3.    I began work as a prison consultant in matters related to federal confinement
4  following my retirement from the BOP in September 2009.  My last four positions were Warden,
5  Federal Detention Center SeaTac, Washington (July 2003 to September 2009); Chief of Security
6  Technology, BOP (September 2000 to July 2003); Associate Warden, Federal Detention Center
7  Brooklyn, New York (December 1997 to September 2000); and Jail Administrator, Federal
8  Correctional Institution, Tucson, Arizona (October 1995 to December 1997).  As the Warden of
9  the Federal Detention Center in SeaTac, Washington, I was in charge of the administrative and
10 organizational aspects of the facility.  I supervised various tasks such as planning, organizing and
11 reviewing work, managing personnel issues, and communicating effectively with employees and
12 union representatives on employee-management matters.  I also decided on the need, and
13 developed plans, for organizational changes; assessed program impact at the local level and the
14 organization as a whole; determined policy and operating guidelines; and administered general
15 personnel policy regarding matters of significant importance.

16       4.    As the Chief of Security Technology for the BOP, I oversaw and contributed to
17 developing and evaluating policy, audit guidelines, security equipment, facility design, security
18 standards, security equipment testing, and various correctional technology issues.  I liaised with
19 federal and state law enforcement agencies, ensured that security equipment and services complied
20 with the Department of Justice policies, and helped establish nationwide standards for metal
21 detectors and coordinated the adoption of new standards for video surveillance in the prison
22 setting.  I provided expert guidance in the field of correctional technology and presented at various
23 conferences.

24       5.    From 2010 to 2019, I served as a Program Manager, overseeing the daily operation
25 of the Martin Hall Juvenile Detention Center in Medical Lake, Washington.  In addition to this, I
26

1 conducted PREA audits at U.S. prison facilities, which I continue to do.[1]  I have completed 40 such PREA audits over the past ten years, including at adult correctional institutions in the private and public sectors, residential re-entry centers (halfway houses), county jail facilities, and juvenile detention centers.

6. I have been retained by counsel on behalf of Changpeng Zhao, who is currently pending sentencing in the Western District of Washington for one count of failure to maintain an effective anti-money laundering program in violation of 31 USC §§ 5318(h), 5322(b), (c), (e), and 31 CFR §1022.210.  Counsel for Mr. Zhao requested I provide my professional opinion regarding the potential risks that Mr. Zhao may face if he were to be sentenced to a term of incarceration in BOP custody.

7. If Mr. Zhao is incarcerated in a BOP facility, his wealth and status as a public figure would expose him to a risk of threats to his physical and mental health, including but not limited to theft and extortion.

**Federal Detention Center SeaTac and Challenges Facing the BOP**

8. Based on my experience, due to Mr. Zhao's imprisonment range being less than 24 months[2] and his status as a deportable alien, it is highly probable that he will be designated by the BOP to serve his sentence at the Federal Detention Center ("FDC") SeaTac, where I previously served as Warden.

9. The FDC SeaTac is an administrative facility that houses federal inmates.  Defendants are mostly pre-trial or presentence defendants.  A small work cadre of inmates designated to the FDC SeaTac comprises the institution's workforce.  These inmates work in the facilities department, food service, and commissary.  At the FDC SeaTac, living arrangements are split across multiple floors and inmates that live within the confines of the building, with very

---

[1] PREA was enacted to establish a "zero-tolerance standard" for rape in prisons in the United States.  42 U.S.C. § 15602(1) [now 34 U.S.C. § 30301(1)].

[2] Based on an offense level of 12 and a criminal history category of I, resulting in a Guideline range of 10 to 16 months.

1   limited outdoor activity. There is little natural light, and most inmates' lives, except for the
2   minimal outdoor recreation time, are spent indoors in the confines of a cell or cell block. The
3   recreation area is not technically "outside," as it is obstructed by an overhead roof. The indoor
4   recreational area is a 40 x 60 foot space with access to the outside air via ventilation cut out around
5   the room at the top of 20 foot walls.

6   10.   Most inmates detained at facilities like the FDC SeaTac are assigned to cells with
7   limited space, consisting of a bunk bed, toilet, sink, metal desk, and a small locker for personal
8   items. Generally, a small, narrow window affords some daylight.

9   11.   The Office of Inspector General ("OIG") continues to highlight the BOP's
10  difficulties in hiring its full complement of correctional officers and other critical staff.
11  Understaffing continues to affect BOP operations. Staffing issues impact FDC SeaTac; the
12  institution currently has a correctional staff far below the ideal number of 120 correctional officers
13  needed to safely manage the facility. During my tenure as Warden of SeaTac from July 2003 to
14  September 2009, our goal was to have a minimum complement of 110 correctional officers.
15  However, in recent months, the staffing levels at FDC SeaTac have not surpassed 55 correctional
16  officers. Operating a facility with such a reduced staff affects the efficiency of all operations. The
17  staff shortage at the BOP, and specifically FDC SeaTac, has led to a situation where correctional
18  officers are forced to work 16-hour shifts, which is detrimental to their performance and attention.
19  Additionally, non-correctional staff members are being assigned to work as correctional officers,
20  which seriously threatens the safety and security of the inmates and staff. This is because they
21  may not be as familiar with the duties and responsibilities of a correctional officer and may end up
22  cutting corners with policy and procedure. For instance, a staff member from the Business Office
23  may be assigned to work as a correctional officer, which diverts their attention from their primary
24  responsibilities and adversely affects the services provided to the inmate population. Moreover, a
25  Business Office staff member is unfamiliar with the security procedures that a correctional officer
26  must follow, which can lead to critical security lapses. The consequences of such a failure can be

catastrophic.

12. According to the OIG, the BOP also continues to experience a shortage of health services personnel. Since 2016, the OIG has consistently reported on BOP's failure to staff critical healthcare positions. Unfortunately, the situation has not improved. In the past three years, the overall fill rate for institution health services positions never exceeded 85 percent, and the fill rate declined from August 2021 through at least July 2022, which appears to be driven by a decrease in hiring and an increase in resignations. Currently FDC SeaTac is operating with eight unfilled healthcare positions, which is nearly half of the total 19 roles in the healthcare department. As a result, inmates who become ill are at risk their medical needs cannot be met. A recent article highlights the challenges faced by inmates at FDC SeaTac regarding medical care, and states "medical care [at FDC SeaTac] is severely lacking, leaving serious health conditions undiagnosed and untreated."[3]

**Concerns Regarding Mr. Zhao's Safety in a Low-Security Facility**

13. BOP utilizes a security-level classification system that allows former high-security inmates who commenced their sentences in a high-security facility to earn the opportunity to eventually be transitioned to low- and medium-security prisons. As an Administrative Facility, FDC SeaTac houses inmates of all security levels: minimum, low, medium, and high. If sentenced to a term of imprisonment, Mr. Zhao would encounter offenders of all security levels and potentially be prey to predators with high security designations due to his naivety concerning prison experiences and his financial resources. In my experience, defendants like Mr. Zhao, who held professional roles and are intellectually well-equipped, are perceived by other inmates as having access to outside funds and are subject to abuse. It is not uncommon for more aggressive inmates to threaten violence, extorting weaker, more naive inmates to transfer funds to the other inmate's family or commissary account. Mr. Zhao will also be at risk of theft of his personal effects

---

[3] *SeaTac Federal Detainees Grow Desperate Amid Lack of Medical Care*, SEATTLE TIMES (Feb. 26, 2024), available at https://www.seattletimes.com/seattle-news/law-justice/seatac-federal-detainees-grow-desperate-amid-lack-of-medical-care/.


and commissary items.

14. Upon arrival at the unit, the other inmates will try to learn more about the new inmate. This will not be difficult given the press coverage in Mr. Zhao's case and his notable public persona. Inmate families are often used to conduct this research. Mr. Zhao has an account on X (formerly Twitter) with his picture and multiple millions of followers. The inmates will take less than a day to find out his financial standing.

15. There are a variety of ways to manage wealth in prison. Most inmates who have access to money will keep to themselves. As they purchase commissaries, other inmates will notice and ask questions about where their money comes from. There is no safe way to answer this question. The extorting inmate often will just take what he wants and not say anything to the victim. The victim inmate will keep quiet and just purchase more commissary. If this pattern of behavior continues, the thefts will continue and increase. Ultimately, the victim inmate will begin to object, and threats of violence will ensue. In this situation, the victim will continue to provide commissary or request protective custody. It is the most difficult part of surviving in prison: does the victim fight, accommodate the extorter's demand, or report the issue and be placed in protective custody?

16. As the commissary extortion continues, it will move into a straight pay-for-protection situation in which Mr. Zhao will be asked to send money to an inmate's family for continued safety while in prison. Mr. Zhao will coordinate this with his family. He will contact his family and request that money be sent to a specific account, and protection will be provided. The efforts to extort money from Mr. Zhao will begin as soon as the other inmates know of his wealth and the length of his sentence. A shorter sentence will require quick action on the part of the inmate who is attempting to extort money from Mr. Zhao. If the extorting inmate knows his timeframe is short, he will attempt to score as soon as possible.

17. I personally witnessed these situations as a BOP employee, including as Warden at FDC SeaTac. When we became aware of extortion situations, we placed the victim in

1  Administrative Detention and attempted to find the inmate a new home.  Finding a new home took
2  months.  Although the BOP is working hard to eliminate Administrative Detention, few other
3  options currently exist.
4        18.     Moreover placing Mr. Zhao in a different unit or facility would fail to stop the issue;
5  it would only start the process over again.
6  **Summary**
7        19.     Thus, if Mr. Zhao is sentenced to serve a term of incarceration at FDC SeaTac, he
8  is likely to face physical challenges as well as security risks due to understaffing, inadequate
9  healthcare, and limited living conditions.  Mr. Zhao would also be at risk of extortion and violence
10  due to his perceived wealth and public profile, and BOP's current practices are insufficient to fully
11  protect him from such threats.
12        I declare under penalty of perjury of the laws of the United States of America that the
13  foregoing is true and correct. Executed on April 23, 2024, in Loon Lake, Washington.

*[signature]*

Robert J. Palmquist