# EXHIBIT C

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHANGPENG ZHAO,<br><br>Defendant. | CASE NO. CR 23-179 (RAJ)<br><br>DECLARATION OF<br>JOEL A. SICKLER IN SUPPORT OF<br>DEFENDANT CHANGPENG ZHAO'S<br>SENTENCING MEMORANDUM |

I, Joel A. Sickler, hereby declare under penalty of perjury the following:

**Introduction & Expertise**

1. I have worked in the field of sentencing and prisoner advocacy for over 40 years and currently head the Justice Advocacy Group, LLC, a litigation support firm based in Alexandria, Virginia. I have worked consistently since 1980 on federal sentencing and federal prison-related matters. I have worked as a correctional counselor in the District of Columbia's Department of Corrections (1978 to 1981) and previously served as the Director of Client Services at the National Center on Institutions & Alternatives in Washington, D.C. (1991 to 2003).

2. I have visited 52 federal prisons and have advised clients with inmate matters in 89

1  of the Bureau of Prisons' ("BOP") 122 institutions.  Prior to the abolishment of parole, I
2  represented hundreds of federal inmates before the U.S. Parole Commission.  Based on more than
3  four decades of experience assisting thousands of clients who have been committed to the care and
4  custody of the BOP, I have extensive knowledge of the BOP and its stated mission, services,
5  policies, program statements, regulations, institutions, and standard practices.

6        3.     I have dealt with inmates and officials who have worked with or been confined in
7  BOP facilities at every level of the federal prison system.  I have worked with both staff and
8  inmates at corrections facilities from the most severe (penitentiaries) to the least restrictive
9  (minimum-security camps).  I have worked with inmates and staff at detention facilities utilized
10 by the BOP and the U.S. Immigration and Customs Enforcement ("ICE") facilities for deportable
11 aliens who are either detained pre-trial or awaiting deportation back to their home country.

12       4.     I have reviewed and am thoroughly familiar with the following Program Statement
13 of the BOP: *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 4,
14 2019).  I have spoken on numerous occasions with personnel at the BOP's Designation and
15 Sentence Computation Center ("DSCC")[1] as well as regional and central office officials in the
16 correctional programs administration when seeking clarification about a specific policy/program
17 statement.

18       5.     I have additionally conferred with defense counsel for the Defendant, Changpeng
19 Zhao, in the above captioned matter.  I have reviewed relevant case materials regarding the
20 charges, the Presentence Investigation Report ("PSR"), and potential sentencing guidelines.

21       6.     I have prepared this declaration to provide the Court with information regarding the
22 impact of Mr. Zhao's status as a noncitizen should he be sentenced to a term of imprisonment.
23 First, due to Mr. Zhao's status as a sentenced alien, BOP will classify and assign him to a Federal
24 Correctional Institution (a low-security prison) and not to a minimum-security camp.  Second, he

---

[1] The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas.  All facility designations (the term used for selecting a location of placement) or assignments and inter-facility transfers are processed and made by the DSCC.

will likely serve a period beyond his actual sentence in ICE custody as he awaits deportation. And third, he will be denied the opportunity to be pre-released to the community (to a community-based option such as home confinement, like most U.S. citizen prisoners who pose no public safety risk) toward the end of his sentence.

**Ramifications of Mr. Zhao's Status as a Noncitizen**

7. As a non-citizen of the United States, if Mr. Zhao is sentenced to a term of imprisonment, he will be classified as a "Deportable Alien" which will have significant, and unwarranted, ramifications for his time incarcerated.

8. The BOP defines "Deportable Aliens" as follows: "Deportable Alien. A male or female inmate who is not a citizen of the United States. . . . When applied, the inmate . . . shall be housed in at least a Low security level institution."[2]

9. Ordinarily, after the imposition of a sentence of imprisonment, a U.S. citizen defendant with Mr. Zhao's (non-violent) offense, who has no history of violence, no prior criminal record, and no outstanding detainers would be eligible to be designated by the BOP to a minimum-security prison camp.

10. However, BOP designators also use Management Variables ("MGTV") and Public Safety Factors ("PSF") to account for security considerations not included in their numeric security point system. In Mr. Zhao's case, if he is sentenced to a term of imprisonment, although he will have a total of only one (1) security level point,[3] a PSF of "Deportable Alien" will be assigned to his security classification which will necessarily result in a prison assignment above the "minimum" (or camp) range.

---

[2] *Inmate Sec. Designation & Custody Classification* (BOP P.S. 5100.08, Sept. 4, 2019), Ch. 5, p. 9 (CODE H).

[3] Mr. Zhao's BOP security level scoring utilizing the BP-A337.051 (Inmate Load and Security Designation Form) is estimated to be as follows: he will be allowed to surrender voluntarily (-3 pts.); his offense (property offense > $250,000) severity will be rated "Moderate" (3 pts.); he has no prior criminal history (0 pts.); no history of prior violence (0 points); no history of escape (0 pts.); no outstanding detainers (0 pts.); he is 46-years old (2 pts.); he has graduated high school (0 pts.); and he has no history of substance abuse within the last five years (0 pts.). Therefore, his total security designation points are *two* (2) yielding a security level of "Minimum." Per BOP P.S. 5100.08 (Sept. 4, 2019) at Table 5-2, Security Point Totals of 0-11 equate to an Inmate Security Level of Minimum.

11. The application of the PSF of Deportable Alien is not discretionary – it will be applied in Mr. Zhao's case. Mr. Zhao will be designated as a low-security inmate, rather than as a minimum-security one. Low-security prisons generally have security protocols and living conditions far different than what exists at the minimum-security, camp level.

12. There are four main differences between a minimum-security camp versus a low-security prison.

13. The first difference is the perimeter security and other forms of heightened security. Federal Prison Camps ("FPCs") are fenceless compounds that have the appearance and feel of an austere college campus. Camps do not have "controlled movements." A Federal Correctional Institution ("FCI"), on the other hand, is surrounded by barriers to prevent escape: walls, fencing with concertina wire, secured and defensible main gates, security lighting, motion sensors, and roving patrols. Remotely controlled doors, CCTV monitoring, alarms, and physical segregation of units are used within the facility. Inmate movement throughout the facility is highly controlled, with access from one location to another allowed only for ten minutes at the top of each hour. Mass body checks where groups of inmates are strip searched so officers can inspect their bodies for bruises or lacerations indicating violence, or fresh tattoos indicating gang involvement, are sometimes conducted for cause. Such assembly searches are not ordinarily done at the camp level. Housing units are searched far more frequently than at the camp level.

14. The second difference is the institution's size, mindset and crowding: FCIs are five to ten times larger than camps. As a rule, the bigger the institution, the more stressful it is on the general population in the prison. Large FCIs have cramped housing quarters where 90-100 inmates sleep in small cubicles with four or more bunk beds and compete for use of the dozen or so showers, sinks, and toilets. Most BOP facilities house more inmates than they are designed for; however, the camps are less crowded than the low-security FCIs.

15. For instance, in Mr. Zhao's situation, he will likely be assigned to a facility in the Western region of the country, potentially in Washington state or near Los Angeles, California.

1  The closest low-security FCIs to Los Angeles are FCI Lompoc (current population is 932, 8.4%
2  over the rated capacity of 860) and FCI Terminal Island (current population is 953, 22.3% over
3  the rated capacity of 779). In contrast, the four camps located in nearby California (Lompoc,
4  Mendota, Atwater and Herlong) currently house anywhere from 75 to 227 inmates – all four camps
5  are operating under capacity.

6      16.    Overcrowding in FCIs results in cubicles that are quadruple bunked, and in some
7  facilities, inmates are placed on mattresses on the floor in "overflow units." Sleep disturbances
8  (resulting from sleeping on thin mattresses, snoring, constant light, and movement) are common.
9  Noise is incessant in a secure correctional facility, and in some (those that have cubicles, for
10 example), there is little to absorb or otherwise block nighttime noise. Inmates may be awakened
11 repeatedly for late night head counts.

12     17.    Other problems exist in the more crowded FCIs. For instance, there are longer lines
13 to use the telephone, to see a member of your unit team, for medications and checkups, or to use
14 the library. During mealtime, the busy, noisy cafeteria serves institutional food, pre-packaged,
15 pre-made, sometimes days before it is served. Inmates eat in shifts (each housing unit is called in
16 an ever-changing rotation), and if your unit is called last, most of the edible food is gone. Naturally
17 there are also long lines to use toilets, sinks, and showers.

18     18.    The third difference between an FPC and an FCI is the type of inmate. The camps
19 house generally younger offenders principally caught up in the "War on Drugs" who are serving
20 short sentences (less than 10 years) and have often cooperated with the government. These inmates
21 generally are first-time offenders who have committed nonviolent crimes, have minor to no
22 criminal history, and pose no public safety or flight risk. They tend to generally behave well out
23 of fear they will end up in a higher security institution (infractions can penalize a camp inmate
24 with a transfer to a low-security facility, although, if sentenced to a term of imprisonment, Mr.
25 Zhao will automatically end up in a low-security facility). Otherwise, camps house white-collar
26 offenders convicted of non-violent offenses. Inmates at low-security facilities (which also house

drug offenders, but those of the more serious kind) are serving sentences greater than 10 years, likely have a prior record involving a gun or violent offenses, may be gang-affiliated, or are otherwise security or flight risks. FCIs also house all deportable aliens, members of organized crime, drug cartel leaders, and all serious sexual offenders. Statistically, there is a 143 percent greater chance of being assaulted at an FCI as opposed to a camp.[4] Furthermore, the rate of "serious assault" is 553 percent higher in low-security institutions than minimum-security camps.[5]

19.     The last difference is about visitation. At a camp, an inmate's family can drive up to the compound, park in a lot next to the visiting hall, walk in unescorted, show ID and then their incarcerated loved one appears. At an FCI, visitors must proceed to a guarded gate to access the facilities parking area. They are observed by officers on patrol in the parking lot. Once inside the prison, they pass through metal detectors, are subjected to random pat down searches (with vehicles on the property also subject to inspection), their hands are tested for drug use, they are escorted through several checkpoints, and they wait interminably for their friend or family member to be brought to the visiting room (a crowded indoor environment). Meanwhile, the average camp has an outdoor picnic area for visitation during warm months, which means a great deal to the family of someone inside.

20.     Mr. Zhao is a citizen of both the United Arab Emirates (where his partner, Ms. He, and their three young children reside) and Canada. Mr. Zhao will undoubtedly want to return to Ms. He and their children as soon as possible. However, if he should receive a relatively short sentence, and wish to avoid any lengthy period of added detention in an ICE facility, he may request assignment to the Federal Detention Center ("FDC SeaTac") closest to the Canadian border

---

[4] This percentage is based on the average rate per month (per 5,000 inmates) of "inmate on inmate" assault (serious and less serious) from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

[5] *Id.* Serious assault is defined in the *Inmate Discipline Program* (BOP P.S. 5270.09, Aug. 1, 2011), page 44, Table 1 (CODE 101 – "Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished.").

and deport to Canada.  Designation to FDC SeaTac is also a preferred site for assignment of non-citizens often recommended by judges in the Western District of Washington and those in the Northwestern United States.  This may speed up the removal process and thereby allow Mr. Zhao to reunite with his family more quickly.  Unfortunately, such an assignment would bring on its own challenges.

21. FDC SeaTac is rated, in BOP security terms, as an Administrative facility.  The BOP describes Administrative facilities as institutions with special missions, such as the detention of pretrial offenders; the treatment of inmates with serious or chronic medical problems; or the containment of extremely dangerous, violent, or escape-prone inmates.  Administrative facilities are capable of holding inmates in all security categories.[6]  Most federal detention centers are urban high-rises—they are designed to hold the most serious of offenders housing all security levels.  These facilities offer little to no programing, little to no outside recreation or fresh air, and a heightened risk of assault.

22. The unfortunate result in Mr. Zhao's case if he is sentenced to a term of imprisonment is that rather than be be designated to a minimum-security camp, he will instead, based solely on his citizenship status, now be housed in a significantly harsher institution (whether an FCI or an FDC), likely next door or in a bed adjacent to someone with a much more serious criminal background.  Prison is hard enough for even the toughest of souls.  Mr. Zhao is 47 years old and has no prior criminal history or experience with criminal activity.  And he will be imprisoned in a crowded, noisy prison, which employs security measures far beyond what is required for his care and custody.

**Mr. Zhao's Ineligibility for Pre-Release, Re-Entry Transitioning, or a Split Sentence**

23. Mr. Zhao's access to pre-release re-entry transitioning and a productively structured return to his community will also be compromised because of his immigration status as

---

[6] About our Facility, Federal Bureau of Prisons, (last visited Apr. 22, 2024) available at https://www.bop.gov/about/facilities/federal_prisons.jsp.

1  a non-U.S. citizen. Normally, an inmate would be accorded a portion of their sentence for
2  community re-entry through one of the BOP's Residential Re-Entry Centers ("RRC"). But for
3  Mr. Zhao's citizenship status, toward the end of his sentence he would be pre-released to an RRC
4  for a period determined as required by his transitional needs—likely between six and twelve
5  months before his release date.[7] Further, most minimum- and low-security inmates are also pre-
6  released (in addition to their RRC or halfway house time) to home confinement for the last 10
7  percent of their sentence, up to a maximum of six months.[8] Instead of any normal transitional
8  benefits afforded other inmates via pre-release, Mr. Zhao would be held beyond the length of his
9  sentence when he would be transferred to the custody of ICE officials upon formal BOP release.
10 In effect, this could add *over a year* to his sentence.

11     24.     For this same reason, a non-citizen like Mr. Zhao will not receive the benefit of a
12 "split sentence," meaning a sentence in which the defendant serves as least half of their sentence
13 in prison followed by a term of supervised release with a condition that substitutes community
14 confinement or home detention. As a practical matter and as detailed below, once Mr. Zhao enters
15 BOP custody to serve any term of imprisonment, BOP will notify ICE, which typically would
16 place a detainer on Mr. Zhao, requiring BOP to transfer custody of Mr. Zhao to ICE at the
17 completion of his term of imprisonment. Accordingly, rather than serving the second half of his
18 "split sentence" under supervised release, he would spend that time in ICE custody during his
19 deportation proceedings.

20     25.     During any sentence of incarceration, Mr. Zhao will also be denied the
21 rehabilitative programming and related incentives afforded to inmates via the First Step Act
22 ("FSA"). The incentives include the ability to earn "time credits" towards early pre-release to an
23 RRC or home confinement – neither of which are available to non-U.S. citizens. While Mr. Zhao
24 can conceivably "earn" these FSA time credits until such time as a Judicial Removal Order is in

---

[7] 18 U.S.C. § 3624.

[8] *Id.*

place, they will not avail him of any pre-release relief.  Non-U.S. citizens may, however, utilize FSA time credits to reduce the length of their sentence.

**Mr. Zhao Will Face an Extended Sentence During ICE Detention and Removal Proceedings**

26.     As noted above, Mr. Zhao's post-incarceration return home will be further complicated by the difficulty of an ICE detainer that will be placed on him (upon incarceration) to eventually accommodate the process of deporting a foreign national at the completion of his sentence.  ICE's Criminal Alien Program ("CAP") is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails.  The enforcement of removal is overseen by ICE's Office of Detention and Removal Operations ("DRO").

27.     When a prisoner's sentence is complete, they are placed in ICE custody and their status is changed from "prisoner" to "detainee."  Armed ICE agents would transport Mr. Zhao (probably by bus) to a detention center once he is formally released from BOP custody to await the process of being physically removed from the U.S.  Unfortunately, this involves further incarceration at what are typically county jails (contracted by ICE) to wait on processing to finally be sent home.

28.     ICE detention centers, which are privately owned, house deportable aliens and offer few rehabilitative and release preparedness programs.  These detention facilities hold detainees of all security levels and offense types.  Privately-run and operated prisons have consistently been under investigation over previous decades for poor management, lack of programming, lower-level of medical care and heightened rates of assaults.  These deficiencies in privately-run correctional facilities caused President Biden to order the closing of all privately-owned BOP facilities in January 2021.[9]  Unfortunately, this order did not affect ICE's use of them.

---

[9] Executive Order 14006, officially titled "Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities," is an executive order signed by U.S. President Joeseph R. Biden, Jr., on January 26, 2021.

29. The State of Washington has one ICE detention facility that is operated by a private company, the GEO Group, Inc., called the Northwest Detention Center ("NWDC") in Tacoma. The University of Washington's Center for Human Rights has been instrumental in researching the allegations of neglect at the NWDC, which they documented in a seven-part series of reports from March 2020 to August 2023 detailing issues of medical neglect, the use of solitary confinement, reports of sexual assault and abuse, and lack of food sanitation.[10]  More recent follow-up by the Center for Human Rights in February 2023 clearly revealed that despite receiving letters of concern from the U.S. Congress and complaints from employees and detainees at the NWDC, ICE has repeatedly failed to respond appropriately to exercise control over the operations of the GEO Group at the NWDC.  The last installment in the reporting series is a research update which details the death of an inmate held in solitary confinement for a total of 1,244 days. Notably, of the ten longest placements in ICE solitary confinement in the nation between 2018 and 2023, five were at Tacoma's NWDC.[11]

30. Another disturbing result of the formal ICE deportation process is the length of time one can be held after their sentence has been satisfied.  It can take up to six months for arrangements (internally within the U.S. and with officials of one's home country) to finalize the details necessary to complete this process.  All the while an individual who should have been released from custody continues to languish in a strange and dangerous place while bureaucratic paperwork is half-heartedly shuffled between U.S. government agencies.  Then there is the paperwork processed by the home country in coordination with the U.S.  All of this is very time-consuming and illustrates how an incarceratory sentence would impose a more substantial hardship on Mr. Zhao than it would upon a similarly situated U.S. individual.

---

[10] *Conditions at the Northwest Detention Center*, UNIVERSITY OF WASHINGTON, CENTER FOR HUMAN RIGHTS (last visited Apr. 22, 2024) available at https://jsis.washington.edu/humanrights/projects/human-rights-at-home/conditions-at-the-northwest-detention-center/.

[11] University of Washington, Center for Human Rights, *NWDC Conditions Research Update: Charles Leo Daniel's Deat at NWDC in Context*, UNIVERSITY OF WASHINGTON, CENTER FOR HUMAN RIGHTS (Mar. 15, 2024)  available at https://jsis.washington.edu/humanrights/2024/03/15/nwdc-conditions-research-update-daniel-death-in-context/.

**Incarceration is a Disproportionate Punishment in the Case of Mr. Zhao**

31.     As described above in detail, the severe consequences of non-citizenship are not justified in the case of this non-violent, first time offender, who does not pose a public safety risk, and who voluntarily appeared in the United States to accept responsibility. Furthermore, Mr. Zhao waived his right to be charged by indictment and pled guilty to the Information, thus saving the courts and government both time and money.

32.     Mr. Zhao has been allowed to remain free on bond as he awaits his sentencing. The government has conceded that Mr. Zhao is not a public safety concern, and he has continued to abide by all the conditions of his pre-trial release.

33.     By all accounts, this gentleman is truly not in need of the heightened security of a Low-Security Correctional Institution (or FDC SeaTac). Mr. Zhao should not be disparately treated simply because he is a noncitizen. He is, in every way, the opposite of an offender who resided in the United States illegally, who committed a violent offense, who also had prior offenses – who would be considered a dangerous flight risk.

34.     To address the risk of disproportionate punishment, Mr. Zhao could instead be sentenced to probation or to probation with a condition of home confinement. I understand from discussions with counsel for Mr. Zhao that arrangements have been made to ensure that any sentence of home confinement in the United Arab Emirates could be served on the same terms as served in the United States.

**Summary**

35.     In summary, if Mr. Zhao is sentenced to a term of incarceration, he would be assigned to a prison facility beyond his security needs solely because of his immigration status. He will be placed at unnecessary risk. At a low-security assigned facility, he will be subjected to a more hostile environment and more unsanitary conditions than he would be subjected to in a minimum-security facility. The daily personal stress of incarceration in a higher than necessary security level will be palpable for Mr. Zhao, who is has never spent any time in prison. He will

also serve a period significantly beyond his actual sentence in ICE custody as he awaits deportation—and he will be denied an otherwise standard transfer to a community re-entry opportunity at the end of his sentence.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed on April 23, 2024, in Alexandria, Virginia.

**/s/ Joel A. Sickler**
Joel A. Sickler, Founder
Justice Advocacy Group, LLC